## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **RACHEL HALLOWS SABBATS,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:21CV00198 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD W. CLARKE,** | ) | JUDGE JAMES P. JONES |
| **ET AL.,** | ) | |
| Defendants. | ) | |

*Rachel Hallows Sabbats, Pro Se Plaintiff; Laura Maughan, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE & PUBLIC SAFETY DIVISION, Richmond, Virginia, for Defendants.*

Plaintiff Rachel Hallows Sabbats, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, asserting primarily that she has been deprived of constitutional rights related to her status as a transgender female housed in a male prison facility and suffering from gender dysphoria. The defendants have filed a Motion to Dismiss and a Motion for Summary Judgment, to which Sabbats has responded. After review of the parties' submissions, I conclude that the defendants' motions must be granted. I also conclude that Sabbats' motions seeking injunctive relief must be denied.

# I. BACKGROUND.

When Sabbats filed her Complaint and Amended Complaint, she was incarcerated at Pocahontas State Correctional Center (Pocahontas), a prison facility for male inmates operated by the Virginia Department of Corrections (VDOC). Later Sabbats was confined at Sussex I State Prison (Sussex I). Recently the court received notice that she had been transferred to Red Onion State Prison (Red Onion), where she is presently confined. Both Sussex I and Red Onion are male prison facilities.

Sabbats entered VDOC custody in 2007 and has been assigned to male prisons ever since. In 2018, Sabbats was diagnosed with gender dysphoria and now identifies as a transgender female.[1] She has taken hormones for a few years and has

---

[1] Gender dysphoria is

[A] marked incongruence between one's experienced/expressed gender and their assigned sex, lasting at least six months, and manifesting by at least two of the following:

- A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)

- A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender . . .

- A strong desire for the primary and/or secondary sex characteristics of the other gender

developed breasts and other feminine characteristics, but she has not undergone gender affirming surgery.

Liberally construing Sabbats' Amended Complaint,[2] she asserts four separate claims, as follows:

> Claim One:  A Fourteenth Amendment Equal Protection claim against defendant Harold W. Clarke, Director of VDOC, based on the fact that Sabbats is a transgender female confined at a male prison facility.
>
> Claim Two: An Eighth Amendment claim against Clarke and defendant Kevin Punturi, Warden of Pocahontas, based on Sabbats' allegation

---

- A strong desire to be of the other gender (or some alternative gender different from one's assigned gender)

- A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender)

- A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender)

Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. Text Revision 2022). To meet the criteria for a gender dysphoria diagnosis, the person must also experience "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.; see Williams v. Kincaid*, No. 21-2030, 2022 WL 3364824, at *5–6 (4th Cir. Aug. 16, 2022) (discussing history and significance of this criteria).

[2]  After Sabbats filed her initial Complaint, she submitted numerous items seeking to supplement that document.  The court repeatedly denied these requests, notifying her that such piecemeal submissions would not be considered and directing that if she wished to assert additional facts or claims, she should file a unifying amended complaint. Thereafter, she did in fact file an Amended Complaint.  Nevertheless, she has continued to submit untitled letters to the court about recent events or additional documentation without any formal request to amend her pleading.  While I have reviewed all of Sabbats' submissions, I do not construe any of them to raise any additional claims for relief outside of those she has presented in the Amended Complaint.

that male prison staff did not announce their presence when entering Sabbats' housing area at Pocahontas while female staff did announce their presence in any male housing area.

Claim Three: An Eighth Amendment claim alleging deliberate indifference to a serious medical need, brought against defendant M. Murphy, a Senior Psychologist at Pocahontas, and defendants Dr. Cary and Dr. Fink, based on Sabbats' allegations that these defendants approved Sabbats to receive gender affirmation surgery, but then rescinded their approval of the surgery after she was charged with disciplinary infractions.

Claim Four: A First Amendment access to courts claim against Punturi based on Sabbats' assertion that a piece of incoming mail marked as privileged was opened outside of her presence, she was not notified, and she did not receive the contents of that mailing in violation of due process.

Sabbats seeks money damages, as well as injunctive relief directing that she be placed in a female prison facility or housed by herself and that she be approved for gender reassignment surgery. The defendants have moved for summary judgment as to Claims One and Three and have moved to dismiss for failure to state a claim as to Claims Two and Four.

## II. THE MOTION TO DISMISS.

### A. The Standard of Review.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–63 (2007). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.[3]  In considering the motion and the record, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." *Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014).  A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  Rather, a plaintiff's factual allegations must "nudge[ ] [her] claims," *Twombly*, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." *Iqbal*, 556 U.S. at 678–79.

Sabbats brings her lawsuit pursuant to 42 U.S.C. § 1983.  Under this section, an aggrieved party may file a civil action against a person for actions taken under color of state law that violate her federal constitutional rights.  *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013).  Defendants Clarke and Punturi move for dismissal of Sabbats' Claims Two and Four.

### B.  Hazardous Condition.

In Claim Two of the Amended Complaint, Sabbats asserts what she terms as an Eighth Amendment claim against Clarke and Punturi.  She alleges that male prison staff did not announce their presence in Sabbats' housing area at Pocahontas like female staff were required to do.  Sabbats asserts that an unspecified provision

---

[3]  I have omitted internal quotation marks, alterations, and citations here and throughout this Opinion, unless otherwise noted.

of the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30301, et seq., requires that "staff of the opposite gender must announce their presence." Am. Compl. 8, ECF No. 49. Sabbats claims that this gender-specific difference in policy at Pocahontas deprived her of the sort of privacy and safety in the presence of male officers that male inmates were afforded when female officers entered an area only after announcing their presence. Sabbats also alleges unspecified "sexual misconduct involving two separate officers" at an unidentified facility on an unspecified date. *Id.* at 9. I construe Claim Two as asserting that the challenged Pocahontas policy difference exposed Sabbats to unsafe conditions in violation of the Eighth Amendment and violated PREA.

As an initial matter, I must grant the defendants' Motion to Dismiss as to any separate claim Sabbats is attempting under PREA. "Nothing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the Act." *De'lonta v. Clarke*, No. 7:11-CV-00483, 2012 WL 4458648, at *3 (W.D. Va. Sept. 11, 2012) (collecting cases), *aff'd*, 548 F. App'x 938 (4th Cir. 2013) (unpublished). "The PREA is intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue. . . . The statute does not grant prisoners any specific rights." *Chinnici v. Edwards*, No. 1:07-cv-229, 2008 WL 3851294, at *3 (D. Vt. Aug. 12, 2008). Thus, I conclude that Sabbats has no claim actionable under § 1983 based on her

belief that the defendants' officer announcement policies at Pocahontas somehow violated PREA. And if the prison's announcement policies did not comply in some way with VDOC regulations, that alleged violation of state law also does not support any claim independently actionable under § 1983. *Riccio v. Cnty. of Fairfax,* 907 F.2d 1459, 1469 (4th Cir. 1990).

The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). To establish a claim under the Eighth Amendment that officers failed to protect her safety, a prisoner must make two showings: (a) that objectively, she was exposed to "'conditions posing a substantial risk of serious harm'" and she suffered a serious injury, and (b) that subjectively, the prison official at issue had a "sufficiently culpable state of mind." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

To meet the objective element, the inmate must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). The court must evaluate the conditions in light of contemporary standards of decency, considering that the Eighth Amendment "does not mandate comfortable prisons" but only prohibits "extreme deprivations." *Id.* at 166. Conditions are "extreme enough to satisfy the objective component of an Eighth Amendment claim" only if the inmate

"produces evidence of a serious or significant physical or emotional injury resulting from the challenged conditions." *Id.* The deprivation must amount to more than the type of "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993). The plaintiff has the burden to show that the risk of harm from the challenged condition was so grave that it violated contemporary notions of decency and that it resulted in serious or significant physical or emotional injury. *Id.* at 1379–81.

The subjective element of the hazardous condition standard requires proof of deliberate indifference — the plaintiff must show that the defendant knew of and disregarded an excessive risk to inmate safety or health. *Farmer*, 511 U.S. at 837. Deliberate indifference "entails 'more than ordinary lack of due care for the prisoner's interests or safety,' or 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 835).

Sabbats' allegations simply do not meet either prong of the Eighth Amendment constitutional standard. Because the presence of male officers in a male prison is obvious and expected, I cannot find that their failure to announce their entry into every housing area constitutes a deprivation of life's necessities. And Sabbats

does not state facts showing how male staff members' failure to announce their presence at Pocahontas ever subjected her to any risk of serious harm or caused her such harm.[4]   Sabbats claims that staff sexual misconduct of an unspecified nature occurred during her incarceration.  But she does not state facts linking these vague sexual misconduct allegations to the condition she challenges — male officers' failure to announce their presence when entering her housing unit.

I also find no stated facts suggesting deliberate indifference related to the announcement issue.  Sabbats has not shown that the defendants knew of and disregarded an excessive risk to inmate safety or health, related to male officers' failure to announce.  *Farmer*, 511 U.S. at 837.  I will grant the defendants' Motion to Dismiss as to Sabbats' Eighth Amendment and PREA claims related to this challenged condition.[5]

---

[4] For example, the defendants provide evidence of accommodations Pocahontas provided for Sabbats.  For example, Sabbats could ask any staff person in the pod to notify mental health that she wanted to talk to someone, and staff would notify the mental health department about that request.  Records indicate that while at Pocahontas, Sabbats spoke with a mental health staff person at least 15 times between June 1 and August 2, 2021, as often as three days in a row.  Resp. Opp'n Mot. TRO Murphy Aff. ¶ 5, ECF No. 32-1.  Staff also made physical accommodations.  For example, shower procedures at Pocahontas were designed to accommodate transgender inmates' privacy.  Resp. Opp'n Mot. TRO Johnson Aff. ¶¶ 9–11, ECF No. 32-2.  Staff placed only one inmate at a time in the shower area behind curtains, while other inmates remained in their cells.

[5] I note that any claim for injunctive relief against defendant Punturi related to this claim is now moot, since Sabbats is no longer confined in Punturi's custody at Pocahontas. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) ("[A]s a general rule, a prisoner's transfer or release from a particular prison moots his claims for injunctive . . . relief with respect to his incarceration there.").

C.  Incoming Mail.

In Claim Four of the Amended Complaint, Sabbats sues Ponturi because an unspecified officer opened a piece of incoming mail marked as privileged outside Sabbats' presence, did not notify her, and did not provide her the contents of the mailing.  Sabbats refers to the item as "legal mail" and asserts that VDOC policy requires legal mail to be opened only in the inmate recipient's presence.  Am. Compl. 18, ECF No. 49.  Sabbats filed a copy of the envelope at issue with her intial Complaint.   Compl. Ex. 1, ECF No. 1-2.   It was marked "Privileged Correspondence" with "Huffman's Services" in Sugar Grove, Pennsylvania listed as the return address.  *Id.*  According to online advertising, Huffman's Services is not a law firm or an attorney's office.  It is a private business that claims to offer negotiation of sentence reductions and other litigation-related services to inmates for a fee.  In the photocopy of the envelope, the corner of a piece of paper appears to be emerging from the envelope's opened top.  Sabbats alleges that she never received the contents of the envelope or notice that the contents had been confiscated.  Sabbats asserts that these events violated her right to access to courts, her attorney-client privilege, and her due process rights.  She does not specify what form of relief she seeks against Ponturi for these violations.

"[T]o plead a claim that [s]he was denied access to the courts, [] a plaintiff must identify with specificity, a non-frivolous legal claim that the defendants'

actions prevented h[er] from litigating." *Oquinn v. Baker*, No. 7:08CV426, 2008 WL 4275964, at *1 (W.D. Va. Sep. 17, 2008) (citing *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Vague and conclusory allegations about mere delays or inconveniences to an inmate's legal work cannot support a denial of access claim. *Strickler*, 989 F.2d at 1383.

Sabbats fails to state how her litigation of any intended, nonfrivolous legal claim was hindered because this one mailing from Huffman's Services was opened outside her presence or because she never received its contents. Thus, she fails to state any viable claim that the alleged loss of this mailing deprived her of the right to access the court. Furthermore, even assuming that someone improperly opened the mailing and took or lost its contents without notice, Sabbats offers no indication that these events resulted from any intentional effort to interfere with her ability to litigate. *See Pink v. Lester*, 52 F.3d 73, 78 (4th Cir. 1995) (holding that "negligent conduct that results in a denial of access to the courts" is not actionable under § 1983). Finally, since her own exhibit does not demonstrate that the mailing came from an attorney, I cannot find that any attorney-client privilege was implicated here.

Sabbats also claims that deprivation of the mailing occurred without due process — namely, without notice. Allegations that prison officials randomly deprived an inmate of her property, whether intentionally or as a result of negligence, do not state any constitutional claim "if a meaningful postdeprivation remedy for the

loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Sabbats possessed a tort remedy under Virginia state law to recover any property value represented by the missing mailing. Va. Code Ann. § 8.01-195.3. Thus, she cannot prevail in a constitutional claim under § 1983 for the alleged loss of that item without due process.

For the stated reasons, I will grant the Motion to Dismiss as to Claim Four.

### III.   MOTION FOR SUMMARY JUDGMENT.

#### A.   Summary Judgment Standard.

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, Sabbats must present sufficient evidence that could carry the burden of proof of her claims at trial. *Id.* at 252. She "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in her favor. *Id.* at 248.

Thus, the court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).   A pro se litigant's verified complaint and amended complaint, or other verified submissions must be considered as affidavits and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge." *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021).   Where a pro se plaintiff fails to respond to a defendant's specific evidence contradicting the conclusory allegations of her complaint or other submissions, however, that defendant may be entitled to summary judgment. *Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 875 (4th Cir. 1992).

One group of defendants — Clarke, Dr. Cary, Dr. Fink, and psychologist Murphy — have moved for summary judgment as to Claims One and Three of the Amended Complaint.

## B.  Housing and Equal Protection.

In Claim One, Sabbats contends that by continuing to house her in a male prison facility, VDOC Director Clarke is violating her equal protection rights under the Fourteenth Amendment.   Sabbats complains that she is similarly situated to female inmates and transgender male inmates (biological females taking hormones

to become more masculine), but she is treated differently. According to Sabbats, both these categories of inmates are housed in female prison facilities.[6]

In support of the defendants' motion, they submit an affidavit by Dr. Cary, the Chief Psychiatrist for the VDOC, dated October 22, 2021.[7] Dr. Cary and Dr. Fink are members of the VDOC's Gender Dysphoria Steering Committee (Committee). The Committee is comprised of health professionals and corrections officials and is charged with assessing the needs of VDOC's transgender population in general and the needs of particular VDOC inmates who have been diagnosed with Gender Dysphoria. The group meets approximately every three months

> to discuss medical and psychiatric or psychological developments in treatment, requests from inmates who need gender affirming accommodations, questions from VDOC facilities concerning the safe management of transgender inmates who may have unique needs, and

---

[6] Sabbats contends that from a housing perspective, she is similarly situated to female inmates because of the feminine physical changes to her body, caused by the hormone treatments, and because of government documents she has obtained that refer to her as female, including a birth certificate. She also asserts that she is similarly situated to transgender male inmates' physical characteristics. She states, "it is well documented' that transgender males on testosterone become more energetic, irritable, aggressive, and strong, with "an increased interest in sexual activity" and an enlarged clitoris nearly the size of an average male penis — three to five inches in length. Am. Compl. 4–6, ECF No. 49. In contrast, Sabbats characterizes transgender females as experiencing "a decrease in sex drive" and even impotence, and a loss of strength. *Id.* at 5–6. Sabbats apparently argues that if a transgender male can be safely housed in a female prison, given his physical attributes, then Sabbats as a transgender female with her hormonally induced physical changes could also be safely housed in a female prison.

[7] The facts relevant to consideration of Sabbats' claims One and Three on summary judgment are largely undisputed, unless otherwise noted.

other issues related to Gender Identity Dysphoria or an inmate's transgender status.

The Steering Committee also considers requests or recommendations for gender affirmation surgery or other outside medical treatment that these inmates may need.

Mem. Supp. Mot. Summ. J. Cary Aff. ¶ 5-6, ECF No. 63-1.

The Committee is involved in periodic reviews of each transgender inmate in VDOC custody on a case-by-case basis to ensure that each is assigned to safe and suitable housing.  In making housing assignments, the Committee considers many factors about the inmate:  transgender status, sexual assault risk (the risks of being a sexual assault victim or perpetrator), criminal history (including particular violent or sexual crimes), institutional adjustment, institutional needs and bed space, and personal safety.

At present, the Committee has found that Sabbats is appropriately assigned to a male prison for several reasons.  Sabbats is biologically a male and has a history of committing violent crimes, including sexual assault.  She is currently serving a total sentence of 51 years in prison for the following offenses:

a. Object Sexual Penetration: Victim is Spouse – Offense Date July 14, 2007, 40 years to Serve;

b. Malicious Wounding – Offense Date July 14, 2007, 5 Years to Serve;

c. Assault on Law Enforcement – Offense Date November 6, 1999, 3 Years to Serve; and

  d. Assault on Law Enforcement – Offense Date December 18, 1999, 3
   Years to serve.

*Id.* ¶ 13.   To the best of Dr. Cary's knowledge, when Sabbats committed these offenses, she was living and presenting herself as a male, and the victim of the listed object sexual penetration crime was Sabbats' female spouse at the time.

  Sabbats entered VDOC custody in 2007, presenting as a male, known as Ronald Lynn Duncan.  Records indicate that Sabbats first mentioned gender identity issues to VDOC staff in May 2018.  Staff informed Dr. Cary in early October 2018 that Sabbats had transgender issues.  On October 5, 2018, Sabbats underwent an initial assessment for gender dysphoria, and that assessment of her transgender status was updated with additional information on November 9, 2018.  VDOC staff worked out transgender accommodations for her soon after, and she began receiving hormone therapy.

  In considering the possibility of placing Sabbats in a female prison, the Committee must consider safe and appropriate housing for Sabbats, but also the safety of female inmates among whom she would be housed at a female facility.  Most female VDOC inmates are not incarcerated for violent sexual crimes, and many of them have been victims of sexual violence.  "A history of being a victim of sexual assault correlates with an increased risk of being a victim of future sexual assaults."  *Id.* ¶ 22.  The Committee determined in 2021 at the time Sabbats filed this lawsuit and continuing into 2022, that a male prison is appropriate housing for her

— based on her relatively short adjustment period as a transgender female and her history of violence, in particularly, the criminal offense of sexual violence against a female.  Dr. Cary asserts: "That determination is subject to change as Sabbat's institutional history changes, as time passes, and as the risk of Sabbats harming someone appears to decline." *Id.* ¶ 21.

The Equal Protection Clause of the Fourteenth Amendment "does not take from the States all power of classification, but keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).  A viable equal protection claim in the prison context must state facts showing that state officials have treated "differently persons who are in all relevant respects alike." *Id.*  The inmate must also show that "the unequal treatment was the result of intentional or purposeful discrimination." *Id.* at 730-31.  "If [the inmate] makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.* at 731.  A prison policy or practice that treats similar inmates differently withstands constitutional review if the defendants show that it "serves a legitimate state interest and . . . the challenged classification is rationally related to" that interest. *Moss v. Clark*, 886 F.2d 686, 690 (4th Cir. 1989).

As an initial matter, Sabbats has not demonstrated that she is similarly situated in all relevant respects to biologically female inmates, housed in VDOC female

prison facilities. Sabbats has some female physical attributes from her hormone treatment, she has legally adopted a female name, and she has documentation referring to her as a female. These external factors are, no doubt, important to Sabbats, but they alone do not make her similar to female inmates in all relevant respects, as evidenced by her continued demand for gender affirmation surgery.

Sabbats has also failed to demonstrate that she is similarly situated in all relevant respects to transgender male inmates housed in female prisons. First, the evidence indicates that she entered custody as a male, whereas transgender males in VDOC facilities either entered custody as females or as transgender males assessed to be safely housed in a female facility. At the most, Sabbats' evidence of similarity to such inmates is her own generalized statements about her personal understanding of the effects of hormone treatments on males and females. As discussed, she asserts that after such treatment, females develop more masculine traits and tendencies, whereas male inmates on hormone therapy tend to become more feminine. In the prison setting, however, administrators tasked with assigning inmates to safe and appropriate housing must consider far more factors than physical attributes such as strength, aggressiveness, and sex drive. And again, Sabbats, despite her collection of documentation in her female name and her intended future gender, remains a biological male with a history of violent behavior. On the other hand, the evidence is that biological female inmates and transgender males housed in VDOC female

prisons are not likely to have any history of violent criminal actions or sexual offenses. In short, Sabbats does not show that she is treated differently than other inmates in VDOC custody who are similar to her in all relevant respects.

In any event, Sabbats fails to refute the defendants' evidence that the Committee does not decide prison housing assignments based only on an inmate's gender at birth, her current genitalia, or her other physical characteristics. Rather, the Committee makes case-by-case, multi-factored evaluations of appropriate housing for each of the transgender inmates in VDOC custody. In this analysis, the Committee considers not only Sabbats' adoption of a female name and acquisition of female-name documentation, but also her past history of sexual violence and other assaultive actions, the relatively short period of time since she began the complex transition from male to female, and her recent actions that are rightfully considered in assessing her level of overall mental and emotional stability and self-control.

Sabbats also admits that officials have made accommodations for her transgender status while she is housed in male prison facilities. For example, at Pocahontas, only female officers would conduct any strip search or urine drug test that Sabbats had to undergo. The defendants have also provided evidence that when Sabbats showered at Pocahontas, all other inmates had to be inside their cells. I have no reason to believe that the other male facilities where Sabbats has been or is now confined do not make similar accommodations for her.

Sabbats mentions an instance in the past few years when she was allegedly threatened by a male inmate, but her own account indicates that officials issued an order to keep that inmate separate from Sabbats in the future.   While Sabbats generally expresses some fears for her safety while housed in a male prison,[8] she has not offered evidence contradicting the defendants' submissions about the case-by-case analysis the Committee makes regarding each transgender inmate's housing

---

[8] It is well established that a transgender female confined with male inmates faces risks of physical assault unless officials provide specific accommodations to alleviate those risks. *Williams v. Kincaid*, 2022 WL 3364824, at *14 ("The safety risks of housing transgender women in men's prisons are by now well-recognized.").   In the *Williams* case, the transgender plaintiff had been undergoing hormone therapy and living as a female for 15 years before her incarceration, but she had not undergone surgery to alter her male genitalia. *Id.* at *1.   She alleged that under jail policy, a transgender woman who had not undergone such surgery would "invariably be housed with men" because of her genitalia, placing her at an increased risk to suffer violence by other inmates. *Id.* at *14.   She alleges that jail officials refused to recognize her as a female, to promptly provide her hormone therapy treatment, or to make any accommodations for her transgender status in housing, clothing, personal pronouns, or body searches. *Id.* at *2.

Sabbats, on the other hand, has focused on the male officials' failure to announce their presence in her housing area, not her general safety in a male prison.   Sabbats' case is also factually distinguishable from the *Williams* case.   As discussed, her allegations indicate that VDOC officials are aware of the risks that her transgender status presents and have made accommodations to minimize those risks, such as separate showers, searches by female officers, and hormone therapy and counseling.   Most importantly, in her Amended Complaint, Sabbats did *not* present a specific claim that merely by housing her in a male prison, officials are failing to protect her against a risk of violence, in violation of her Eighth Amendment rights.

and safety or the reasons they have continued to assign her to a male prison. Furthermore, I conclude that the factors the Committee considers are reasonably related to furthering legitimate penological interests in safety and security for the female inmates who would be housed with Sabbats at a female facility and to ensuring Sabbats' own readiness for further transition at this time.

The defendants' evidence also indicates that the Committee will regularly revisit the issue of housing for Sabbats at least every three months, leaving open the possibility of a future transfer to a female prison facility or other housing arrangement. Finding no genuine issue of material fact on which Sabbats could prove an equal protection violation arising from her ongoing assignment to a male prison at present, I conclude that the defendants are entitled to summary judgment as a matter of law on Claim One.[9]

---

[9] Based on the record evidence that the Committee makes its housing assignment decisions based on each individual transgender inmate's medical and mental health needs and safety, I did not consider Sabbats' equal protection claim as asserting gender discrimination. Some courts, however, have treated some transgender inmates' equal protection claims as gender discrimination claims, requiring intermediate scrutiny. *See, e.g., Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *9 (D. Mass. June 14, 2018). Under intermediate scrutiny, "classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives" to be upheld. *Craig v. Boren*, 429 U.S. 190, 197 (1976). The "burden of justification" for the classification "is demanding and it rests entirely on the State," and "the reviewing court must determine whether the proffered justification is exceedingly persuasive." *United States v. Virginia*, 518 U.S. 515, 533 (1996).

If I were to apply the intermediate scrutiny standard to the equal protection claim in the *Sabbats* case, I would find for the defendants. The defendants have provided evidence that the Committee and its careful, individualized assessment of treatment and housing

C.  Gender Affirmation Surgery Delay.

In Claim Three, Sabbats asserts that after she had been verbally informed that she was approved for gender affirmation surgery, Dr. Cary, Dr. Fink, and Pocahontas Warden Murphy then delayed the surgery because she had incurred disciplinary infractions.  Sabbats asserts that the delay of her surgery under these circumstances violated her rights under the Eighth Amendment.

The record indicates that Sabbats first began hormone treatments related to her Gender Dysphoria in late 2018 or early 2019.  Allowing for a lengthy period of adjustment to transgender status is "the standard practice in a community setting," Dr. Cary explains.  Cary Aff. ¶ 20 n.2, ECF No. 63-1.

> Transgender people and people with a diagnosis of Gender Dysphoria do not all require surgical intervention.  Gender Dysphoria – like many mental health issues – presents on a spectrum.  While one patient may find relief with minimal physical interventions (such as a change in clothing, the addition or removal of facial or body hair, hairstyle, pronouns, or cosmetic appearance), others may not experience relief without surgical intervention.  Some may be initially helped by minimal interventions and later determine (along with their medical provider), that surgery is necessary.  Even surgical intervention is not identical for those who may need it. . . . The general practice of requiring a patient to experience life as a person of a different gender for an extended period of time allows time for hormone therapy to take effect (and be adjusted, as necessary) and for the person to adjust to his

---

needs for transgender inmates serve, and are substantially related to, important governmental objectives — ensuring necessary medical and mental health care to inmates and safe conditions for them and the inmates housed with them.  Indeed, I find from the record evidence that the defendants' justification for its decisions about Sabbats' housing and care are "exceedingly persuasive." *Id.*

or her new physical appearance and assess [his or her] emotional and mental health status while under the care of an endocrinologist and a mental health professional before taking more permanent steps toward surgery.

*Id.*

Dr. Cary states that although the Committee has been considering Sabbats' desire and suitability for gender affirmative surgery for some time, the Committee has never approved her for that surgery. The VDOC does not have medical providers on-site who can conduct surgical consultation for, or perform, gender affirmation surgery. Any consultation for such a surgery, and the surgical procedure itself, must be referred to an outside provider. Before the Committee would approve an inmate for that process, its members would need to find that the person had demonstrated stability of both mental and physical health; had shown a history of stable adjustment to living within the identified gender; and had exhibited clarity of thinking and the mental capacity to make an informed decision about undergoing surgery. Even after an inmate is approved for a consultation appointment, if that inmate is deemed to be not sufficiently stable mentally to be transported safely to an outside provider, the appointment will likely be rescheduled.

During a meeting on July 21, 2021, the Committee discussed Sabbats' surgery options. They considered evidence that shortly before the meeting, Pocahontas officials had charged Sabbats with three disciplinary infractions after she had some sort of an outburst at that facility. These were serious charges: Inciting to Riot,

Rioting, or Acting in a Manner that Disrupts the Orderly Operation of the Institution; Possession of Contraband; and Intentionally Destroying, Altering, Damaging, or Defacing State or Any Person's Property. The Committee felt that the nature of the charges signaled a need for an additional mental health assessment period before approving Sabbats for a surgical procedure. The members "had security concerns that transporting Sabbats to an outside medical provider for consultation or treatment in the immediate future may have posed an increased risk that Sabbats would attempt to disrupt the transportation or otherwise become unmanageable while outside the facility." *Id.* ¶ 35. Dr. Cary states, "An inmate's disciplinary record does not dictate whether or not they receive medical or mental health treatment. However, the behavior underlying an inmate's disciplinary record may necessitate a delay or alteration in the way the treatment is provided, particularly if the behavior is violent or indicates possible mental instability." *Id.* ¶ 38.

The Committee considered Sabbats and her surgical needs again when next they met on September 28, 2021. During the meeting, the Committee requested an update on Sabbats' mental health status as necessary before any referral for a surgical consultation. Dr. Cary states, "Sabbats is still being considered for a referral to a surgeon. No final decision has yet been made." *Id.* ¶ 37.

"Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir.

2018).  "Courts treat an inmate's mental health claims just as seriously as any physical health claims."  *Id.* (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)).

As with other Eighth Amendment claims, I must apply a two-part, deliberate indifference analysis to Sabbats' complaint that she is being denied surgery.  The first facet of the inquiry is objective and requires facts showing that the inmate's medical or mental health condition is "serious — one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  The second facet of the standard, requiring evidence of deliberate indifference, is subjective.  It is not sufficient to show that an official should have known of risks presented by the inmate's medical condition; rather, the official must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk of harm posed by the official's own action or inaction.  *Id.* at 178.

The deliberate indifference component "requires proof of intent beyond mere negligence, errors in judgment, inadvertent oversights, or disagreements between a health care professional and patient about the prisoner's treatment plan."  *DePaola v. Clarke*, 394 F. Supp. 3d 573, 590–91 (W.D. Va. 2019) (citing *Estelle v. Gamble*,

429 U.S. 97, 105–06 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

Sabbats' desired outcome on this claim, a court order for surgery, is simply not in the nature of a federal lawsuit under § 1983. I am not a court of medical appeals that can order whatever tests or treatments the plaintiff believes she needs or wants. *Bowring*, 551 F.2d at 48 (finding that in a constitutional claim regarding proper course of treatment for inmate's medical needs, "the essential test is one of medical necessity and not simply that which may be considered merely desirable").

Sabbats claims she was at some point approved for gender affirmation surgery. As evidence, she offers her own assertions that the defendants or others have verbally informed her that she was approved for surgery. She does not submit any documentation or affidavit from a medical professional to support that claim, or to contradict the defendants' medical evidence that the Committee has not yet approved surgery for Sabbats and does not believe it to be appropriate for her yet. Moreover, Sabbats offers no evidence of a substantial risk that delay of that surgery and a longer adjustment period living in her new gender identity before surgery will cause her any serious harm. On the record, I cannot find any genuine material fact on which Sabbats could demonstrate a serious medical need for the surgery at this time or any earlier time.

In addition, Sabbats has not shown deliberate indifference.  It is undisputed that transforming from a male to a female is a complex process that cannot be undertaken lightly or quickly, without adequate time for changes to occur and be assimilated.  The process of providing this change to a VDOC prisoner is even more fraught with questions and complicating factors to consider, since it requires referral to outside providers and unique personal and group safety concerns.  The Committee will continue to review Sabbats' need and readiness for surgery on a regular and frequent basis.  I find no evidence that anyone has ignored, or is ignoring, her medical and mental health needs related to her gender issues.  *See Keohane v. Fla. Dep't. of Corr. Sec'y,* 952 F.3d 1257, 1267 (11th Cir. 2020) (holding that given new prison policy regarding gender dysphoria treatments that "properly attends to inmates' individualized medical needs," challenge to transgender policy was moot).

Furthermore, I cannot find that anyone has denied Sabbats the option to undergo gender affirmation surgery merely because of her recent disciplinary charges.  On the contrary, the evidence is that the Committee rightfully considered her behavior during the incident that led to the charges in considering her mental and emotional fitness for the surgery.  Clearly, Sabbats disagreed with the Committee's assessment of her readiness for the surgery.  Such disagreements between health care professionals and a patient over that patient's appropriate treatment plan simply do not suffice to support a finding of deliberate indifference as required for a viable

Eighth Amendment claim regarding medical or mental health care. *DePaola*, 394 F. Supp. 3d at 590. And on the record, Sabbats has not presented facts showing that any defendant, at any time, knew that failure to provide her with immediate gender affirming surgery placed her at an excessive risk of serious harm. *Jackson*, 775 F.3d at 178.

Based on the foregoing, I find no genuine issue of material fact on which Sabbats could establish that any defendant denied her adequate medical care for her serious medical or mental health needs in violation of the Eighth Amendment. I conclude that the defendants are entitled to summary judgment as a matter of law. I will grant the Motion for Summary Judgment as to Claim Three.

IV. MOTIONS FOR PRELIMINARY OR PERMANENT INJUNCTION.

Also pending are two motions Sabbats submitted that the court construed and docketed as seeking interlocutory injunctive relief. One also asks for permanent injunctive relief. Specifically, Sabbats asks the court to order the VDOC "to identify her as a female inmate," based on her legal documentation. Mot. Prelim. Inj. 1, ECF No. 73. Sabbats states, "If the inmate was properly identified as the female inmate that she is as legal documents clearly show, then Plaintiff argues that then proper steps will accompany the Injunction Sabbats prays for that will protect her while incarcerated in a male prison facility." *Id.* at 3.

In the most recent motion, Sabbats is apparently attempting to add support for her desire to be classified as a female.  She states that she has called the PREA hotline to report sexual harassment — based on male officers who waited outside the shower for her to finish bathing and getting dressed.  She contends that these officers were watching her, but also admitted later to investigators that they had only been doing their jobs, waiting to escort her back to her cell when she was done.  Sabbats also states that after she used the PREA hotline to report the sexual misconduct, someone "later threatened [her] with violence," told her to keep quiet, and said "they would hate to find out [she] had hung [her]self."  Mot. Prelim Injunc. 2, ECF No. 104.  She reports seeing another inmate beaten by officers, but does not say when or where, or who the officers were.  Finally, Sabbats states that she is "fearful of retaliation" and "fear[s] for [her] life" for unspecified reasons.  *Id.*

A party seeking preliminary injunctive relief must state facts clearly showing "that [s]he is likely to succeed on the merits, that [s]he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in h[er] favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Each of these four factors must be satisfied. *Id.*  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an

extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22.

As discussed, Sabbats does not raise a claim in this § 1983 case that the defendants have been or are failing to protect her safety while she is classified as a male and housed in male prisons. Yet, both of her pending interlocutory relief motions address safety concerns about recent events that are not directly related to any legal claim the court is considering in the underlying case. "[A] preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997)). To warrant interlocutory relief, the movant "must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Id.* Sabbats fails to show the required type of relationship between her underlying claims and her requests for interlocutory injunctive relief, based on her desire to be classified as female.

In any event, Sabbats has not stated facts showing the likelihood of imminent and irreparable harm to her health or safety in the absence of the requested court intervention. At the most, she states her belief that an order for VDOC officials to classify her as a documented female might cause "proper steps" to "protect her" in unspecified ways from unspecified harm. Mot. Prelim. Inj. 3, ECF No. 73. Yet, her

-30-

motions do not describe any past harm she has suffered merely from having VDOC officials classify her as male or any future harm that would be avoided merely by requiring them to refer to her as female instead.  I must deny her motions.

## V.  Conclusion.

For the reasons stated, it is hereby **ORDERED** as follows:

1.  The defendants' Motions to Dismiss and Motion for Summary Judgment, ECF Nos. 59 and 62, are GRANTED, and all claims against the defendants are DISMISSED WITH PREJUDICE; and

2.  Sabbats' Motions for Permanent or Preliminary Injunction, ECF Nos. 73 and 104, are DENIED.

A separate Judgment will enter herewith.

ENTER:   September 12, 2022

/s/  James P. Jones
Senior United States District Judge